UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

SCOTT FAINE AND STEPHEN FAINE,

                                Plaintiffs,

-against-

CITY OF NEW YORK, POLICE OFFICER MARK XYLAS, SHIELD NO. 11251, POLICE OFFICER EBONY WILLIS, SHIELD NO. 9979, POLICE OFFICER WILLIAMS, SHIELD NO. 18160, POLICE OFFICER PEREZ, SHIELD NO. 8269, SGT MICHAEL WHITE SHIELD NO. 5324, POLICE OFFICER BRIAN GREIG, SHIELD NO. 971, POLICE OFFICER JOB BELLEVUE, SHIELD NO. 16310, POLICE OFFICER JUNER CEVALLOS, SHIELD NO. 31208, POLICE OFFICER JIMMY CLERGE, SHIELD NO. 1541, POLICE OFFICER MELISSA JOSS, POLICE OFFICER JOHN DOES,

                                Defendants.

------------------------------------------------------------------------ x

FIRST AMENDED
   COMPLAINT AND
JURY DEMAND

Docket No. 11CV3299

ECF CASE

Plaintiffs Scott Faine and Stephen Faine, by their attorneys, Stoll, Glickman & Bellina, LLP, for their complaint allege as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which plaintiffs seek relief through 42 U.S.C. §1983 for the violation of their Fourth and Fourteenth Amendment rights in addition to violations of the laws and Constitution of the State of New York.

2.      The claim arises from two incidents that occurred almost one year apart. During both incidents, Officers of the New York City Police Department ("NYPD"), illegally stopped and questioned, assaulted and arrested plaintiff Scott Faine, who suffers from

severe seizures. During both incidents, when plaintiff's brother, Stephen Faine, attempted to explain his brother's fragile medical condition to the officers, he was also assaulted and arrested.

3.     Plaintiffs seek monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §1983 and §1988 and the laws and Constitution of the State of New York.

5.     The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

6.     The amount in controversy exceeds $75,000.00 excluding interest and costs.

## VENUE

7.     Venue is laid within the Eastern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District.

## PARTIES

8.     Plaintiff resided at all times here relevant in Kings County, City and State of New York.

9.     The City of New York (or "the City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the

policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

10.    Police Officer Mark Xylas was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Xylas was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Xylas was under the command of the 81st precinct on May 17, 2010. On information and belief, at all times relevant hereto, Defendant Xylas was under the command of the 81st precinct and is sued in his individual capacity.

11.    Police Officer Ebony Willis was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Willis was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Willis was under the command of the 81st precinct on May 17, 2010. On information and belief, at all times relevant hereto, Defendant Willis was under the command of the 81st precinct and is sued in his individual capacity.

3

12.   Police Officer Williams was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Williams was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Williams was under the command of the 81st precinct on April 14, 2011. On information and belief, at all times relevant hereto, Defendant Williams was under the command of the 81st precinct and is sued in his individual capacity.

13.   Police Officer Perez was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Perez was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Perez was under the command of the 81st precinct on April 14, 2011. On information and belief, at all times relevant hereto, Defendant Perez was under the command of the 81st precinct and is sued in his individual capacity.

14.   SGT MICHAEL WHITE SHIELD NO. 5324, was, at all times here relevant, a sergeant of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant White was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them

arresting plaintiff without probable cause. Upon information and belief, defendant White was under the command of the 81st precinct on April 14, 2011. On information and belief, at all times relevant hereto, Defendant White was under the command of the 81st precinct and is sued in his individual capacity.

15.   POLICE OFFICER BRIAN GREIG, SHIELD NO. 971, was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Greig was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Greig was under the command of the 81st precinct on April 14, 2011. On information and belief, at all times relevant hereto, Defendant Greig was under the command of the 81st precinct and is sued in his individual capacity.

16.   POLICE OFFICER JOB BELLEVUE, SHIELD NO. 16310, was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Bellevue was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Bellevue was under the command of the 81st precinct on April 14, 2011. On information and belief, at all times relevant hereto, Defendant Bellevue was under the command of the 81st precinct and is sued in his individual capacity.

17.   POLICE OFFICER JUNER CEVALLOS, SHIELD NO. 31208, was, at all

times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Cevallos was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Cevallos was under the command of the 81st precinct on April 14, 2011. On information and belief, at all times relevant hereto, Defendant Cevallos was under the command of the 81st precinct and is sued in his individual capacity.

18. POLICE OFFICER JIMMY CLERGE, SHIELD NO. 1541, was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Clerge was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Clerge was under the command of the 81st precinct on April 14, 2011. On information and belief, at all times relevant hereto, Defendant Clerge was under the command of the 81st precinct and is sued in his individual capacity.

19. POLICE OFFICER MELISSA JOSS, was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Joss was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Joss

was under the command of the 81st precinct on April 14, 2011. On information and belief, at all times relevant hereto, Defendant Joss was under the command of the 81st precinct and is sued in his individual capacity.

20.   At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

### NOTICE OF CLAIM

21.   Within 90 days of the events giving rise to these claims, plaintiffs filed written notices of claim with the New York City Office of the Comptroller.  Over 30 days have elapsed since the filing of those notices, and this matter has not been settled or otherwise disposed of.

### FACTUAL ALLEGATIONS

### Brooklyn's 81st Precinct

22.   In February 2011, a Brooklyn jury agreed that plaintiff Carolyn Bryant was, in part, arrested due to NYPD's "custom and policy" regarding arrest quotas that contributed to her arrest in the 81st precinct. Key testimony in the case came from Capt. Alex Perez, who told jurors that indeed arrest quotas were key in judging cops' productivity.[1]

23.   "The NYPD Tapes Series" (or the "Series"), a Village Voice series by Graham Rayman, which began on May 5, 2010, detailed how the pressure for arrests and summonses led to quotas which in turn led to alleged violations of civil rights in Bed-

---

[1] "NYPD Quotas: Brooklyn Jury Says 'Yes, Virginia, They do Exist'" by Graham Rayman http://blogs.villagevoice.com/runninscared/2011/02/nypd_quotas_bro.php last visited on July 7, 2011. The case settled after the verdict for $75,000.

Stuy's 81st Precinct. The series relied on secret tapes made by Police Officer Adrian Schoolcraft, who was assigned to the 81st Precinct at the time.[2]

24.    From the Voice "Series",[3] the investigation unveiled that police officers in the 81st precinct were routinely threatened with discipline (transfers, shift changes, partner changes, and assignment changes) by their superiors if they did not make their monthly quota of summonses, stop-and-frisks, arrests, and community visits. "Again, it's all about the numbers," a sergeant says on October 18, 2009.

25.    The Series also revealed "In a campaign to clear corners and building stoops in the neighborhood, the [81st] precinct commander and his subordinates issued orders that may have led patrol officers to violate citizens' civil rights. The commander ordered officers to make arrests even when they didn't witness the misconduct themselves. Cops were told to arrest people and "articulate" a charge later, or arrest people and hold them for hours simply for the purpose of clearing a corner, rather than for a specific criminal act." " 'If they're on a corner, make 'em move' " a sergeant says on November 23, 2008. " 'If they don't want to move, lock 'em up. Done deal. You can always articulate [a charge] later.' " "How hard is a 250[stop and frisk report]? I'm not saying make it up, but you can always articulate robbery, burglary, whatever the case may be," a sergeant says on March 13, 2009. "It's still a number. It keeps the hounds off."

26.    The policies, procedures, customs and practices of the NYPD Lieutenants, Captains, Sergeants and Officers at the 81st precinct led to plaintiffs' arrests on May 17, 2010 and April 14, 2011.

---

[2] "The NYPD Tapes" Blog begins on May 5, 2010 with reports on the secret tapes made by Adrian Schoolcraft and the Department's subsequent actions, in addition to additional tapes from officers from the Bronx and Queens, and related news
http://blogs.villagevoice.com/runninscared/the_nypd_tapes/index.php?page=5 last visited July 7, 2011
[3] The NYPD Tapes Series: The Cliff Notes Version
http://blogs.villagevoice.com/runninscared/2010/05/the_nypd_tapes.php last visited July 7, 2011

Incidents Involving Plaintiffs

First Incident – May 17, 2010

27. On May 17, 2010, plaintiff Scott Faine stood in the courtyard in front of the building he lived in, 300 Vernon Avenue, Brooklyn, New York in the 81st Precinct.

28. Scott, who was 30 at the time of the incident, has suffered from noctural epilepsy since he was 17. In 2007, Scott began having seizures during the daytime which would last 3-6 minutes and would have full body shakes. In 2008, his girlfriend reported to his NYU Comprehensive Epilepsy Center physician that he had multiple day and nighttime seizures, 5-12 times per day, which would cause him to move his hands, arms, legs, head and body involuntarily.

29. On May 17, 2010, around 7:30 p.m., Defendant officers Xylas and Willis, approached Scott and asked him for his identification. Scott said that he lived in the building he was standing in front of. When his brother, Stephen, saw the officers talking to Scott, he came downstairs and explained to the officers that Scott lived in the building. Scott and Stephen are twin brothers.

30. The officers still wanted proof that Scott lived at 300 Vernon Avenue. Stephen went inside the house to look for Scott's identification. Scott's neighbors in the courtyard shouted to the officers that Scott lived in the building.

31. Stephen could not find Scott's identification and the officers left.

32. A few minutes later, Scott was still standing in front of his house and four police officers, including Xylas and Willis, returned. The officers aggressively walked towards Scott. He turned away and tried to go inside of his house. An officer followed him up the stairs. Stephen started to shout "don't touch my brother". The officer grabbed

Scott's shirt, preventing him from going into the house. Scott's mother yelled from her balcony that Scott lived in the house. Stephen, at the bottom of the stairs, shouted at the officers that his brother suffered from seizures.

33.   An officer pulled Stephen off of the stairway, where Scott and the other officer were still standing.

34.   A second officer ran up the stairs and the two officers started to pull on Scott's arms. Scott, suffering from a seizure, held the staircase railing. The officers continued to pull at his arms.

35.   Other officers stood at the bottom of the staircase with their batons out, yelling at Stephen, who also stood at the bottom of the staircase.

36.   Scott collapsed into another seizure with the two officers holding his arms. More officers came up the staircase to carry Scott down. Scott continued to be gripped by seizures.

37.   After the officers had Scott at the bottom of the staircase, he was pushed down face first onto the landing. Officers continued to wrestle his arms behind his back. Stephen continued to shout "He has seizures".

38.   Scott continued to have seizures at the police precinct. His family came to the precinct and urged the officers to take him to the hospital immediately. Officers delayed Scott's removal to the hospital. Eventually, Scott was taken to Woodhull Hospital. Xylas made false statements to the Complaint Room screener from the prosecutor's officer that Scott was intentionally hitting his own head into a soda machine, a glass door, and the floor and yelling "I'm going to sue you, I'm loving this."

39.   At Woodhull Hospital, Scott requested seizure medication and reported having

three seizures in the precinct. He was cuffed with hand and leg shackles and had a bump on the right side of his head. He was diagnosed with having had seizures.

40. A community affairs officer, William Menderson, came to the house that evening and spoke with several witnesses.

41. On June 8, 2010, Scott went to visit his regular physician at the Epilepsy Center. His girlfriend reported increased frequency of his seizures, stuttering and slurring of speech, and that he was suffering from headaches and backaches.

42. Scott was charged with disorderly conduct and resisting arrest. Police Officer Mark Xylas made false statements in the Kings County Criminal Complaint, under penalty of perjury, that he "observed defendant pacing back and forth in the lobby of the above described location for approximately 7 minutes with a bulge in defendant's sweater pocket, and when the deponent's approached defendant to question the defendant regarding the bulge, the defendant did yell profanities at the deponent, and did refuse to remain at the above location by walking away from the deponent and up a set of stairs causing a crowd of approximately 50 people to gather." Xylas made further false statements that Scott "did resist a lawful arrest by grabbing stairs railing, did refuse to let go, did struggle with the deponent and other officers and did refuse to be handcuffed."

43. Scott took an adjournment in contemplation of dismissal in December 2010.

44. Stephen Faine was also arrested for obstruction of governmental administration, resisting arrest, and possession of a pocket knife. Stephen took an ACD at arraignments.

### Second Incident – April 13, 2011

45. On April 14, 2011, Stephen took Scott to the Social Security office in Bushwick to pick up a receipt for Scott's Social Security Benefits. The receipt has the date, Scott's

name and address and date of birth on it. Scott put this receipt in his pocket.

46. After Scott and Stephen left the Social Security office, Scott met with his girlfriend in a deli near his house. Stephen left Scott with his girlfriend. Scott had been having seizures that morning, so his girlfriend told him to hold onto the pole of the scaffolding outside the deli while she got them both drinks so that he wouldn't collapse and fall down.

47. While Scott was holding onto the scaffolding, around 10:30 a.m., defendant Officers Williams and Perez approached plaintiff and asked him for identification. Scott produced his Medicaid identification, with his photograph, and the Social Security receipt he had from that morning.

48. An officer said to Scott about the receipt "how do I know you didn't just pick this up off the floor." When Scott stopped answering the officers' questions, the officer said "You're going for a ride down the block".

49. The man who worked inside the deli saw the officers and told Scott's girlfriend that the officers were talking to Scott. She stepped outside the deli and said told the officers that she was with Scott and they were getting drinks in the deli. The officers called for back-up. When back-up arrived, Scott was put in handcuffs. Scott's girlfriend tried explaining that Scott had seizures.

50. A neighbor who saw the officers talking to Scott went to Scott's home and told Stephen. Stephen came back to the deli in time to see defendants handcuffing Scott. Stephen explained that Scott suffered from seizures.

51. The officers told Stephen to take a walk because they were taking Scott to the precinct. Stephen was arrested as he tried to explain that Scott was having seizures. A

man who wrote down the officers' names and handed the paper to Scott's girlfriend was also arrested for obstruction of governmental administration.

52.   Scott had more seizures in the precinct and was taken to Woodhull Hospital.

53.   He was charged with two counts of disorderly conduct. He took an ACD after two court appearances.

54.   Stephen was charged with two counts of disorderly conduct. He has refused several ACD offers and the charges are still pending.

55.   At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate plaintiffs' rights. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.  They failed to intervene in the obviously illegal actions of their fellow officers against plaintiffs.

56.   During all of the events above described, defendants acted maliciously and with intent to injure plaintiffs.

<u>DAMAGES</u>

57.   As a direct and proximate result of the acts of defendants, plaintiffs suffered the following injuries and damages:

   a.      Violation of their rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of their persons;

   b.      Violation of their rights pursuant to the Fourteenth Amendment of the United States Constitution to due process;

c.      Violation of their New York State Constitutional rights under Article 1,

Section 12 to be free from an unreasonable search and seizure;

d.      Violation of their New York State Constitutional rights under Article 1,

Section 6 to due process;

e.      Physical pain and suffering;

f.      Emotional trauma and suffering, including fear, embarrassment,

humiliation, harassment, emotional distress, frustration, extreme inconvenience,

anxiety; and

g.      Loss of liberty.


<u>FIRST CAUSE OF ACTION</u>
42 U.S.C. § 1983
False Arrest and False Imprisonment
(Against Officer Defendants)

58.   The above paragraphs are here incorporated by reference.

59.   On May 17, 2010 and April 14, 2011, officer defendants wrongfully and
illegally arrested, detained and imprisoned plaintiffs.

60.   The wrongful, unjustifiable, and unlawful apprehensions, arrests, detentions,
and imprisonment of plaintiffs were carried out without a valid warrant, without
plaintiffs' consent, and without probable cause or reasonable suspicion.

61.   At all relevant times, defendants acted forcibly in apprehending, arresting, and
imprisoning plaintiffs.

62.   Throughout this period, plaintiffs were unlawfully, wrongfully, and
unjustifiably held under arrest, deprived of their liberty, imprisoned and falsely charged.

63.   At all times, the unlawful, wrongful, and false arrest and imprisonment of

plaintiffs were without basis and without probable cause or reasonable suspicion.

64. All of this occurred without any illegal conduct by plaintiffs.

65. Plaintiff Stephen Faine consented to an adjournment in contemplation of dismissal at their first court appearance in 2010. Plaintiff Scott Faine consented to an adjournment in contemplation of dismissal 6 months after his arrest in 2010.

66. Plaintiff Stephen Faine continues to fight his April 14, 2011 arrest. Plaintiff Scott Faine consented to an adjournment in contemplation of dismissal after two appearances.

67. The officer defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive plaintiffs of their constitutional rights secured by the United States Constitution.

68. As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiffs sustained the damages described above.

SECOND CAUSE OF ACTION
New York State Constitution Article I §12
False Arrest and False Imprisonment
(Against All Defendants)

69. The above paragraphs are here incorporated by reference.

70. On May 17, 2010 and April 14, 2011, officer defendants wrongfully and illegally arrested, detained and imprisoned plaintiffs.

71. The wrongful, unjustifiable, and unlawful apprehensions, arrests, detentions, and imprisonment of plaintiffs were carried out without a valid warrant, without

plaintiffs' consent, and without probable cause or reasonable suspicion.

72.   At all relevant times, defendants acted forcibly in apprehending, arresting, and imprisoning plaintiffs.

73.   Throughout this period, plaintiffs were unlawfully, wrongfully, and unjustifiably held under arrest, deprived of their liberty, imprisoned and falsely charged.

74.   At all times, the unlawful, wrongful, and false arrest and imprisonment of plaintiffs were without basis and without probable cause or reasonable suspicion.

75.   All of this occurred without any illegal conduct by plaintiffs.

76.   Plaintiff Stephen Faine consented to an adjournment in contemplation of dismissal at their first court appearance in 2010. Plaintiff Scott Faine consented to an adjournment in contemplation of dismissal 6 months after his arrest in 2010.

77.   Plaintiff Stephen Faine continues to fight his April 14, 2011 arrest. Plaintiff Scott Faine consented to an adjournment in contemplation of dismissal after two appearances.

78.   Defendants, their officers, agents, servants and employees, were responsible for plaintiffs' arrests, detentions and imprisonments during this period of time. Defendant City, as employer of Officer Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

79.   Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of plaintiffs' rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards plaintiffs.

80.   The officer defendants acted under pretense and color of state law and in their

individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive plaintiffs of their constitutional rights secured by the Constitution of the State of New York.

81.    As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiffs sustained the damages described above.

### THIRD CAUSE OF ACTION
False Arrest and False Imprisonment
(Against All Defendants)

82.    The above paragraphs are here incorporated by reference.

83.    Defendants subjected plaintiffs to false arrest, false imprisonment, and deprivation of liberty without probable cause on May 17, 2010 and April 14, 2011.

84.    Defendants intended to confine plaintiffs, plaintiffs were conscious of their confinement and did not consent to their confinement.

85.    Plaintiff Stephen Faine consented to an adjournment in contemplation of dismissal at their first court appearance in 2010. Plaintiff Scott Faine consented to an adjournment in contemplation of dismissal 6 months after his arrest in 2010.

86.    Plaintiff Stephen Faine continues to fight his April 14, 2011 arrest. Plaintiff Scott Faine consented to an adjournment in contemplation of dismissal after two appearances.

87.    Defendants, their officers, agents, servants and employees, were responsible for plaintiffs' arrests, detentions and imprisonments during this period of time. Defendant City, as employer of Officer Defendants, is responsible for their wrongdoing under the

doctrine of *respondeat superior.*

88.   As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiffs sustained the damages described above.

FOURTH CAUSE OF ACTION
42 U.S.C. §1983
Excessive Force
(Against Officer Defendants)

89.   The above paragraphs are here incorporated by reference.

90.   By using excessive force against plaintiffs on May 17, 2010, and failing to intervene on behalf of one another's unlawful and unconstitutional conduct, defendants deprived plaintiffs of their rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. §1983, including, but not limited to, rights guaranteed by the Fourth Amendment to the United States Constitution.

91.   In addition, the officer defendants conspired amongst themselves to deprive plaintiffs of their constitutional rights and took numerous steps in furtherance of such conspiracy, as set forth above.

92.   The officer defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive plaintiffs of their constitutional rights secured by the United States Constitution.

93.   As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiff sustained the damages described above.

FIFTH CAUSE OF ACTION

New York State Constitution Art. I § 12
Excessive Force
(Against All Defendants)

94.    The above paragraphs are here incorporated by reference.

95.    By using excessive force against plaintiffs on May 17, 2010, and failing to intervene on behalf of one another's unlawful and unconstitutional conduct, defendants deprived plaintiffs of their rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. §1983, including, but not limited to, rights guaranteed by Article I Section 12 of the New York State Constitution.

96.    In addition, the officer defendants conspired amongst themselves to deprive plaintiffs of their constitutional rights and took numerous steps in furtherance of such conspiracy, as set forth above.

97.    Defendants, their officers, agents, servants and employees, were responsible for plaintiffs' arrests, detentions and imprisonments during this period of time. Defendant City, as employer of Officer Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

98.    The officer defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive plaintiffs of their constitutional rights secured by the New York State Constitution.

99.    As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiffs sustained the damages described above.

## SIXTH CAUSE OF ACTION
Assault and Battery
(Against All Defendants)

100. The above paragraphs are here incorporated by reference.

101. Upon approaching, pushing, throwing plaintiffs to the ground, handcuffing and arresting plaintiffs on May 17, 2010, defendants made plaintiffs fear for their physical well-being and safety and placed them in apprehension of immediate harmful and/or offensive touching.

102. Upon approaching, pushing, restraining and handcuffing plaintiffs against their consent on April 14, 2011, defendants made plaintiffs fear for their physical well-being and safety and placed them in apprehension of immediate harmful and/or offensive touching.

103. Defendants engaged in and subjected plaintiffs to immediate harmful and/or offensive touching and battered them without their consent.

104. Defendants used excessive and unnecessary force with plaintiffs.

105. Defendants, their officers, agents, servants and employees, were responsible for plaintiffs' arrests, detentions and imprisonments during this period of time. Defendant City, as employer of Officer Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

106. As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiffs sustained the damages described above.

## SEVENTH CAUSE OF ACTION
Negligence
(Against All Defendants)

107. The above paragraphs are here incorporated by reference.

108. Defendants owed a duty of care to plaintiff Scott Faine.

109. Defendants breached their duty to plaintiff by assaulting and attacking plaintiff with force and causing damage to plaintiff.

110. Defendants breached their duty to plaintiff by failing to obtain immediate hospital attention for plaintiff despite knowing, being told by plaintiff's family, and witnessing plaintiff's multiple seizures on both May 17, 2010 and April 13, 2011.

111. Defendants, their officers, agents, servants and employees, were responsible for plaintiffs' arrests, detentions and imprisonments during this period of time. Defendant City, as employer of Officer Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

112. As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiffs sustained the damages described above.

EIGHTH CAUSE OF ACTION
Negligent Hiring & Retention
(Against City Defendant)

113. The above paragraphs are here incorporated by reference.

114. Upon information and belief, defendant City, through the NYPD, owed a duty of care to plaintiffs to prevent the physical and mental abuse sustained by plaintiffs.

115. Upon information and belief, defendant City, through the NYPD, owed a duty of care, to plaintiffs because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated an injury to plaintiff or those in a position similar to plaintiffs' as a result of this conduct.

116. Upon information and belief, defendant officers were incompetent and unfit for their positions.

117. Upon information and belief, defendant City knew or should have known through exercise of reasonable diligence that the officer defendants were potentially dangerous.

118. Upon information and belief, Defendant City's negligence in hiring and retaining the officer defendants proximately caused plaintiffs' injuries.

119. Upon information and belief, because of the defendant City's negligent hiring and retention of defendant officers, plaintiffs incurred damages described above.

NINTH CAUSE OF ACTION
MUNICIPAL AND SUPERVISORY LIABILITY
(Against Defendant City)

120. The above paragraphs are here incorporated by reference.

121. The policies, procedures, customs and practices of the NYPD Lieutenants, Captains, Sergeants and Officers at the 81st precinct which put pressure on officers to stop, question and frisk law-abiding citizens of Brooklyn, make arrests and issues summonses, regardless of probable cause, led to plaintiffs' arrests on May 17, 2010 and April 14, 2011.

122. The City's continuing failure to deter police misconduct has led to ever increasing numbers of lawsuits for repeat routine misconduct by the same officers, same units and same precincts. In 2010, New York City paid out $136 million[4] for the fiscal year, compared to 2009, when it paid out more than $117 million, and 2008, when it paid

---

4 Bob Hennelly's WNYC report, "Amid City Budget Crisis, New Scrutiny on Millions in NYPD Settlements" from June 8, 2011: http://www.wnyc.org/articles/its-free-country/2011/jun/08/amid-city-budget-grappling-new-scrutiny-millions-nypd-settlements/ and June 13, 2011, "With Budget Deadline Looming, City Lawsuits Come Under Scrutiny": http://www.wnyc.org/articles/wnyc-news/2011/jun/13/budget-deadline-looming-city-lawsuits-come-under-scrutiny/, last visited on July 7, 2011

$80 million.[5] In the past ten years, the City of New York has paid nearly a billion dollars on lawsuits brought against the NYPD.[6] More than 40% of those settlements in 2011 stem from excessive force and false arrest.

123.   The widely held assumption is that civil rights lawsuits deter police misconduct. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161, (1992) citing Carey v. Piphus, 435 U.S. 247, 254-257, (1978). "As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts." See Hudson v. Michigan 547 U.S. 586, 598 (2006) citing Correctional Services Corp. v. Malesko, 534 U.S. 61, 70 (2001) and Nix v. Williams, 467 U.S. 431, 446, (1984). "It is almost axiomatic that the threat of damages has a deterrent effect (citation omitted) surely particularly so when the individual official faces personal financial liability." Carlson v. Green, 446 U.S. 14, 21, (1980), citing Imbler v. Pachtman, 424 U.S. 409, 442, and footnote 6 (1976).

124.   However, the City of New York has isolated NYPD officers from accountability for its civil rights lawsuits and, as a result, is preventing civil rights lawsuits from having any deterrent value to the City, the NYPD or its officers. Civil rights lawsuits against police officers have no impact on the officers' careers, regardless of the expense to the City of the officers' lawsuit liability, even after multiple lawsuits.

---

[5] Mayor Michael Bloomberg's preliminary Management Report for FY 2009, available at http://www.nyc.gov/html/ops/downloads/pdf/_mmr/nypd.pdf, see page 115, last visited on February 18, 2010.

[6] "NYPD Has Paid Out Nearly $1 Billion in Claims Over Past Decade," by Associated Press Writers Colleen Long and Jennifer Peltz, http://www.law.com/jsp/article.jsp?id=1202473432953 , October 15, 2010 last available on December 9, 2010.

125. In 1999, former Comptroller Alan Hevesi reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers. This "total disconnect" between officers' liability and NYPD discipline, results in a system where the City pays vast sums to settle false arrests, but the NYPD does nothing to investigate nor address the underlying causes of such false arrests. The City Council, Government Operations Committee, despite being alerted at a City Council hearing on December 12, 2009, and on other occasions, to the obvious problem of officers and precincts with a disproportionate responsibility for civil rights lawsuit liability, has failed to take action to hold officers or precincts accountable. It has likewise failed to hold an investigative hearing into what extent specific officers, units and precincts are disproportionately responsible for New York City civil rights lawsuits.

126. The City is liable for the damages suffered by plaintiffs in that, after learning of their employees' violation of plaintiffs' constitutional rights, they failed to remedy the wrong; they have created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue, and they have been grossly negligent in managing subordinates who caused the unlawful condition or event.

127. The aforesaid event underlying plaintiffs' factual allegations was not an isolated incident. The City has been aware for some time, from lawsuits, notices of claim, complaints filed with the Civilian Complaint Review Board, and judicial rulings suppressing evidence and finding officers incredible as a matter of law, that a disturbing number of their police officers unlawfully search and seize citizens, bring charges against citizens with no legal basis, perjure themselves in charging instruments and testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

Nevertheless, the City has allowed policies and practices that allow the aforementioned to persist.

128. The City has been alerted to the regular use of false arrests by its police officers, through lawsuits, civilian complaints, notices of claim, City Council hearings, newspaper reports, and cases resulting in declined prosecutions and dismissals, but has nevertheless exhibited deliberate indifference to such false arrests; that deliberate indifference caused the violation of plaintiff's constitutional rights in this case. In 2009, New York City has seen a 46 percent jump in payouts to settle claims against the NYPD and has paid out more than $117 million in fiscal year 2009, compared to $80 million in 2008.[7] In the past ten years, the City of New York has paid nearly a billion dollars on lawsuits brought against the NYPD.[8]

129. Nevertheless, the City has repeatedly resisted attempts to catalog even basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. The City's deliberate indifference towards the contents of civil rights litigation, towards individual officers repeatedly named in lawsuits, towards incidents repeatedly occurring in the same precinct, towards patterns of misconduct that arise in civil rights litigation has caused the constitutional violations against plaintiff.

130. Additionally, according to a report of the New York City Bar Association issued in 2000, the City has isolated its law department from the discipline of police officers.

---

[7] Mayor Michael Bloomberg's preliminary Management Report for FY 2009, available at http://www.nyc.gov/html/ops/downloads/pdf/_mmr/nypd.pdf, see page 115, last visited on February 18, 2010.

[8] "NYPD Has Paid Out Nearly $1 Billion in Claims Over Past Decade," by Associated Press Writers Colleen Long and Jennifer Peltz, http://www.law.com/jsp/article.jsp?id=1202473432953 , October 15, 2010 last available on December 9, 2010.

Civil rights lawsuits against police officers have no impact on the officers' careers, regardless of the officers' responsibility lawsuit liability, even after multiple lawsuits. Alan Hevesi, as New York City Comptroller, in 1999 reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers. Nothing has changed since 1999 and the present regarding this "total disconnect" between officers' liability and NYPD discipline, resulting in a system where the City pays vast sums to settle false arrests, but the NYPD does nothing to investigate nor address the underlying causes of such false arrests.

131. The City has also been alerted to the regular use of stop and frisks by its police officers, which disproportionately target people of color, despite the lack criminal evidence that such stop and frisks actually produce, and despite the humiliation, inconvenience and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result. In 2008, of the 531,159 New Yorkers were stopped by the police, 465,413 were totally innocent (88 percent). From the total, 271,602 were black (51 percent); 167,111 were Latino (32 percent); and 57,407 were white (11 percent). In 2007, of the 468,732 New Yorkers were stopped by the police, 407,923 were totally innocent (87 percent). From the total in 2007, 242,373 were black (52 percent), 142,903 were Latino (31 percent), 52,715 were white (11 percent).[9]

132. The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people. In 2008, more than half (51%) of the summonses issued by NYPD officers were dismissed for legally insufficient

---

[9] See New York Civil Liberties Union "Stop and Frisk Report" available at http://www.nyclu.org/issues/racial-justice/stop-and-frisk-practices last visited on February 18, 2010. On the website, the NYCLU collects the same data back to 2004.

evidence. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals" or quotas, resulting in the violation of innocent New Yorker's civil rights.[10]

133. The Civilian Complaint Review Board ("the CCRB"), a City police oversight agency, often finds complainants lack credibility based in part on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced, a practice that often results in not substantiating the most serious charges brought to the CCRB. In addition, the CCRB virtually never initiates their own findings of false statements against officers who have made false statements to the CCRB in their own defense, nor do they initiate findings that officers have failed to report their fellow officers' misconduct; thus, officers have no real incentive to come forward, or to testify truthfully at the CCRB. The CCRB has no enforcement mechanisms once making a finding against an officer; it can only make recommendations to the NYPD, once finding misconduct by an officer.

134. The NYPD, once receiving a substantiated complaint by the CCRB, fails to adequately discipline officers for misconduct. In 2002, the percentage of officers who were the subject of substantiated CCRB complaints who received no discipline was 47%; in 2007, it was 75%.[11] The NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the extraordinarily rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an

---

[10] See WABC's Jim Hoffer's three installments (March 3, May 23 and May 25, 2010) on NYPD quotas available at http://abclocal.go.com/wabc/story?section=news/investigators&id=7461355 last visited May 26, 2010.

[11] The NYCLU issued a report in September 2007 on the CCRB detailing the failure of the NYPD to follow up on substantiated CCRB complaints, among other failures by the City and the CCRB to address police misconduct: "Mission Failure: Civilian Review of Policing in New York City, 1994-2006"

officer, the police commissioner still maintains the power to reduce the discipline against such an officer, which the police commissioner has done on many occasions. This entire procedure provide so many opportunities for meritorious complaints of false arrests to be dismissed or disregarded that there is no credible, effective oversight of police department employees, despite an apparently elaborate set of oversight mechanisms.

135. Further, the City has no procedure to notify individual officers or their supervisors of unfavorable judicial review of their conduct or to calculate the total liability of an individual officer or of a precinct. Without this notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for. Even occasional judicial findings that officers have testified incredibly are not reported routinely to the police department or any oversight agencies.

136. All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal. "Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration-through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department-there is some evidence of an attitude among officers that is sufficiently

widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged." See <u>Colon v. City of New York, et al</u>, 2009 WL 4263362 (E.D.N.Y.)(Weinstein, J.).

137. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights. Despite such notice, the City has failed to take corrective action. This failure and these policies caused the officers in the present case to violate plaintiffs' civil rights, without fear of reprisal.

138. Plaintiffs have been damaged as a result of the deliberate indifference of the Defendant City.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, as follows:

A. In favor of plaintiffs in an amount to be determined by a jury for each of plaintiffs' causes of action;

B. Awarding plaintiffs punitive damages in an amount to be determined by a jury;

C. Awarding plaintiffs reasonable attorneys' fees, costs and disbursements of this action; and

D. Granting such other and further relief as this Court deems just and proper.

<u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

DATED:    November 3, 2011
               Brooklyn, New York

TO:                                     Respectfully yours,
        City of New York
        100 Church Street

New York, NY  10007
Attorneys Quiana Smith-Williams
and Susanna Publicker on behalf of
Police Officer Mark Xylas, Shield
No. 11251, Police Officer Ebony
Willis, Shield No. 9979, Police
Officer Williams, Shield No.
18160, Police Officer Perez, Shield
No. 8269

By: Cynthia Conti-Cook
Bar# CC0778
Stoll, Glickman & Bellina, LLP
Attorneys for Plaintiff
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY  11217
(718) 852-3710
(718) 852-3586
cconti-cook@stollglickman.com

Sgt. Michael White
Shield No. 5324
81st Precinct
30 Ralph Avenue
Brooklyn NY 11221

Police Officer Brian Greig
Shield No. 971
94th Precinct
100 Meserole Avenue
Brooklyn NY 11222

Police Officer Job Bellevue
Shield No. 16310
81st Precinct
30 Ralph Avenue
Brooklyn NY 11221

Police Officer Juner Cevallos
Shield No. 31208
Patrol Borough Brooklyn North
Task Force
179 Wilson Avenue
Brooklyn NY 11237

Police Officer Jimmy Clerge
Shield No. 1541
81st Precinct
30 Ralph Avenue
Brooklyn NY 11221

Police Officer Melissa Joss
Shiled NO. 9035
83rd Precinct
480 Knickerbocker Avenue
Brooklyn NY 11237